**Peggy TROUTT, dba Little Joe's
Tavern, Plaintiff–Appellee,**

v.

**COLORADO WESTERN INSURANCE
COMPANY, Defendant–Appellant.**

**Peggy Troutt, dba Little Joe's Tavern,
Plaintiff–Appellant,**

v.

**Colorado Western Insurance Company,
Defendant–Appellee.**

**Nos. 98–36268, 99–35022.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 2000.

Filed April 2, 2001

John R. Gordon, Reep, Spoon & Gordon, Missoula, Montana, for defendant-appellant/appellee.

Monte D. Beck and John J. Richardson, Beck & Richardson, Bozeman, Montana, for plaintiff-appellee/appellant.

Before: B. FLETCHER, HALL, and TASHIMA, Circuit Judges.

Opinion by Judge CYNTHIA HOLCOMB HALL; Partial Concurrence and Partial Dissent by Judge BETTY B. FLETCHER.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Colorado Western Insurance Company ("CWIC") appeals the district court's judgment after trial holding that a policy which it issued Peggy Troutt ("Troutt") d/b/a Little Joe's Tavern applied to an injury suffered by Terry Engstrand ("Engstrand") sustained during the latter's perfor-mance of a job on behalf of Troutt. Troutt cross-appeals the same district court judgment holding that CWIC neither had a duty to defend Troutt from Engstrand's suit against her, nor breached its agreement with Troutt by failing to investigate the claim and not settling before trial. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm on all issues.

I

In October 1993, Engstrand had almost all of his fingers amputated while working on a team that was splitting firewood for Little Joe's Tavern, a bar owned by Troutt and her husband, Lee, now deceased. The team consisted of Lee Troutt, and patrons of Little Joe's Tavern, all of whom allegedly undertook the wood splitting task in return for a promise of free alcohol from Troutt. Some alcohol consumption occurred throughout the day the wood splitting took place. The amount of such consumption is in dispute: CWIC claims only a moderate amount was drunk by the team while Troutt claims that the vats were flowing freely and that alcohol was a major contributing factor to Engstrand's accident. However, a week after the accident occurred, Lee Troutt gave a statement in which he did not attribute the accident to alcohol.

Seven weeks after the occurrence of the accident, CWIC, the insurance company which issued Troutt's liquor liability insurance, was notified of the accident. CWIC then hired an independent adjustor to investigate the accident. During the investigation, Peggy and Lee Troutt, and their attorney, stated that only one beer had been consumed by the wood splitting team before the accident. The investigator was not notified of Lee Troutt's statement that did not attribute the accident to alcohol at that time even though Troutt's attorney possessed a copy of such statement in his file. Other members of the team also offered statements that did not mention

alcohol as a reason for the accident. Because the investigation failed to turn up any evidence that the accident was alcohol-related, in June 1994, CWIC sent Troutt a letter denying coverage.

Engstrand and his wife, Vickie, filed a personal injury suit against Troutt in state court in June 1995. In their complaint, the Engstrands did not mention alcohol at all. However, Vickie, bartender at Little Joe's Tavern the night before the accident, stated during her deposition that both Lee Troutt and another member of the team were visibly intoxicated when they left the bar at 2:00 a.m., the day of the accident. Lee Troutt admitted that it was possible that he had a hangover the day of the accident. Several members of the team were deposed, and they confirmed that a pitcher of beer was consumed during a break in the work at noon, approximately 45 minutes before the accident occurred.

In March 1996, in the middle of the deposition schedule in the Engstrands' case, Troutt requested that CWIC undertake her defense. Troutt mailed CWIC the Engstrands' complaint, and her policy as proof of its duty to defend. Ten days after Troutt's request, CWIC informed counsel for the Engstrands and Troutt that it was denying Troutt's request to defend her suit because the complaint did not allege facts under which coverage could be obtained in that no injury was alleged to have occurred from the sale, serving, or furnishing of alcoholic beverages. Three days later, the Engstrands offered to settle the case with CWIC for $150,000, the policy limit, even though they never amended their complaint to allege alcohol as a factor in the accident. CWIC did not settle and the case proceeded to trial beginning in November 1996.

At trial Troutt admitted liability, and the case proceeded to a hearing on damages, in which Troutt did not participate, and which resulted in the Montana state court awarding the Engstrands $1,154,262.29. The Montana court made several findings of fact and conclusions of law that pertained to alcohol. In particular, the court noted that the participants on the team understood that upon completion of the wood splitting task, "they would retire to the tavern for drinks on the house," and that during a break, the team "drank a pitcher of beer provided by Little Joe's." The court also noted that there was some evidence that "[Lee] Troutt and [another member of the team] had been drinking excessively at Little Joe's the evening before the accident" and it was possible that Lee Troutt "had a hangover on the morning of the accident." The court concluded as a matter of law, that "the accident arose, at least in part, from the tavern's business of serving alcohol" because of the offer of free drinks upon completion of the project and the fact that free beer already had been served to members of the team while they were at work before the accident occurred.

Following the state court judgment, Troutt sued CWIC in federal court seeking a declaration that CWIC's liquor liability policy provided coverage for the judgment obtained by the Engstrands. The Engstrands sued CWIC for the same reason in state court. CWIC removed this second case to federal court and the two cases were consolidated. Troutt also alleged that CWIC was guilty of breach of contract, and bad faith violations of the Montana Unfair Trade Practices Act for failing to investigate fully the Engstrands' claim and failing to provide a defense and indemnification to her. She also sought punitive damages.

Both parties filed summary judgment motions contending that the state court judgment was binding on the other party. The district court denied both motions explaining that because the issue was not

litigated in state court "[t]here was no resolution of the critical legal issue here— whether the negligent furnishing of alcohol was a contributing proximate cause of the accident." The district court also ruled that the liquor insurance policy was not ambiguous, but such policy was broader than the Montana Dram Shop Act, and therefore, after conducting a bench trial and looking at new evidence presented by Troutt, it ruled that the policy covered the amounts Troutt was obligated to pay as a result of Engstrand's accident up to the policy limit. On all other issues, the district court held in favor of CWIC. Both parties appeal those issues on which they lost before the district court.

## II

Following a bench trial, the judge's findings of fact are reviewed for clear error. *See FDIC v. Craft,* 157 F.3d 697, 701 (9th Cir.1998). However, the district court's conclusions of law are reviewed de novo. *See Dolman v. Agee,* 157 F.3d 708, 711 (9th Cir.1998).

### A. *Preclusion*

CWIC argues that the state court judgment obtained by the Engstrands is preclusive on the proceedings concerning the action before this Court. In particular, CWIC frames its argument as follows: because the state court judgment adjudicated Troutt's liability to Engstrand, the doctrine of res judicata is the final statement of this liability, and thus all issues that were raised, and all issues that could have been raised in that proceeding cannot be re-litigated in the federal court action. Framing the argument in this manner mistakes collateral estoppel, which is the doctrine that could be applicable in this case, with res judicata, which cannot be applicable in this case.

Res judicata and collateral estoppel are two different doctrines which are often confused for each other.[1] The Montana Supreme Court has succinctly explained the difference between the two: "The doctrines differ in that res judicata bars the same parties from relitigating the same cause of action, while collateral estoppel bars the party against whom the claim is asserted, or a party in privity with the earlier party, from relitigating issues which have been decided with respect to a different cause of action." *Federated Mut. Ins. Co. v. Anderson,* 297 Mont. 33, 991 P.2d 915, 926 (1999).

The doctrine of res judicata is based on the public policy notion that at some point, litigation must come to an end. *See Scott v. Henrich,* 283 Mont. 97, 938 P.2d 1363, 1366 (1997). Thus, res judicata not only bars claims litigated in a former action, but also claims that might have been litigated in the former action. *See Balyeat Law, P.C. v. Hatch,* 284 Mont. 1, 942 P.2d 716, 717 (1997). A resolved claim will be res judicata as to subsequent claims if: (1) the parties are the same; (2) the subject matter is the same; (3) the issues are the same and relate to the same subject matter; and (4) the capacities of the

---

1. We rely on Montana state law in our analysis of res judicata and collateral estoppel. The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."

28 U.S.C. § 1738. Citing this statute, we have held that, "[i]n determining the collateral estoppel effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel." *Bugna v. McArthur (In re Bugna),* 33 F.3d 1054, 1057 (9th Cir.1994). The *Bugna* rationale is clearly applicable to the doctrine of res judicata as well.

persons are the same in reference to the subject matter and issues. *See Loney v. Milodragovich, Dale & Dye, P.C.*, 273 Mont. 506, 905 P.2d 158, 161 (1995).

In this case, res judicata is inapplicable because the doctrine only has a preclusive effect on the parties involved in the state court suit, i.e., the Engstrands and Troutt. Thus, res judicata prevents the Engstrands from bringing another personal injury cause of action based on Terry Engstrand's accident against Troutt. CWIC cannot assert the doctrine of res judicata because it was not a party to the original suit. Similarly, res judicata is inapplicable because the causes of action of the two lawsuits are markedly different: the state court action was a personal injury tort suit, the federal court action is a declaratory relief suit based on an allegedly breached insurance contract. The first two elements of the res judicata test are not present here.

 On the other hand, collateral estoppel, also known as issue preclusion, bars the reopening of an issue in a different cause of action that has been litigated and determined in a prior suit. *See Holtman v. 4–G's Plumbing & Heating, Inc.*, 264 Mont. 432, 872 P.2d 318, 322 (1994). The preclusive effect extends to all issues essential to the prior judgment. *See Boyd v. First Interstate Bank of Kalispell, N.A.*, 253 Mont. 214, 833 P.2d 149, 151 (1992). This doctrine has a three-part test: (1) the identical issue raised has been previously decided in a prior adjudication; (2) a final judgment on the merits was issued in the prior adjudication; and (3) the party against whom the plea is now asserted was a party, or in privity with a party, in the prior adjudication. *See State v. Young*, 259 Mont. 371, 856 P.2d 961, 965 (1993). In applying the three-part test, Montana courts have stated that the identity of the issues is the most crucial element of collateral estoppel. *See Holtman*, 872 P.2d at

322. This means that the exact same issue must have been litigated in the prior action. *See Anderson v. State*, 250 Mont. 18, 817 P.2d 699, 702 (1991). In making this determination, courts compare the pleadings, evidence, and circumstances surrounding the two actions. *See Aetna Life Ins. Co. v. McElvain*, 221 Mont. 138, 717 P.2d 1081, 1086 (1986).

Because CWIC insured Troutt for any liability caused by an injury arising out of the sale, service or furnishing of alcohol, the question is: was the issue pertaining to whether Engstrand's injury arose out of the sale, service or furnishing of alcohol litigated and actually decided in the state court action? The evidence pertaining to this inquiry is conflicting. On the one hand, the Engstrands' complaint in state court does not mention alcohol, their negligence assertion being based on the improper use of a front end loader to split the wood. *See* Engstrand Complaint at ¶¶ 6–8, 10–12. Moreover, the alcohol issue was not argued extensively at trial because Troutt admitted liability after only one witness had been heard. *See* State Court's Findings of Fact and Conclusions of Law at 1–2.

On the other hand, depositions took place in the state court case in which questions were asked regarding alcohol consumption. More importantly, the state trial court entered several findings of fact where it indicated that alcohol consumption had taken place the night before the accident, and on a break about 1 hour prior to the accident. *See id.* at 4. Most importantly, the state trial court entered a conclusion of law where it stated that because the team was induced to split the wood with the offer of free drinks, "the accident arose, at least in part, from the tavern's business of serving alcohol." *Id.* at 7. This last sentence seems to point emphatically in the direction which indi-

cates that the alcohol issue was litigated in the state court proceeding.

 However, the collateral estoppel analysis next proceeds to the determination of whether that litigated issue was decided on the merits. In making that determination, Montana courts employ a two-step analysis: (1) the issue has to have been effectively raised in the pleadings or through development of the evidence and argument at trial or on motion; and (2), the losing party had a "full and fair opportunity" procedurally, substantively, and evidentially to contest the issue in the prior proceeding. *See Lane v. Farmers Union Ins.,* 296 Mont. 267, 989 P.2d 309, 317 (1999) (citing with approval *In re Daily,* 47 F.3d 365, 369 (9th Cir.1995)).

 The claim was not adjudicated on its merits because it fails to meet the first prong of the above-stated test. The alcohol issue was not raised by the parties in their pleadings, nor was it developed at trial or through motion practice. Rather, the state court's findings seem to be based primarily on Troutt's admission of liability. Such admission precludes a determination that the issue was actually litigated on its merits. *See Lane,* 989 P.2d at 317 (citing the Restatement (Second) of Judgments § 27, comment e (1982)).

The result of the collateral estoppel inquiry is that the totality of the circumstances. suggest that the issue regarding the alcohol consumption was litigated but was not decided on the merits in the state court proceeding. Therefore, collateral estoppel is not a bar to the litigation of the alcohol consumption question in this case.

**B.** *Liability under the Montana Dram Shop Act*

The insuring language of CWIC's policy provides, in relevant part, that "[CWIC] will pay those sums that [Troutt] become[s] legally obligated to pay as damages because of injury to which [the] insur-

ance applies, sustained by any person if liability for injury arises out of the selling, serving or furnishing of any alcoholic beverage." *See* Liquor Liability Policy at 1. The Montana Dram Shop Act (the "Act") states the following, in relevant part:

Civil liability for injuries involving alcohol consumption

(1) The purpose of this section is to set statutory criteria governing the liability of a person or entity that furnishes an alcoholic beverage for injury or damage arising from an event involving the person who consumed the beverage

. . .

(3) Furnishing a person with an alcoholic beverage is not a cause of, or grounds for finding the furnishing person or entity liable for, injury or damage wholly or partly arising from an event involving the person who consumed the beverage unless:

(a) the consumer was under the legal drinking age and the furnishing person knew that the consumer was underage or did not make a reasonable attempt to determine the consumer's age;

(b) the consumer was visibly intoxicated; or

(c) the furnishing person forced or coerced the consumption or told the consumer that the beverage contained no alcohol.

*See* Mont.Code. Ann. § 27–1–710 (1999).

CWIC asserts that it is the Act which dictates whether Troutt is liable for a tort involving the sale of alcohol, and thus if liability exists under the Act, then coverage is provided by the policy; however, if no liability exists under the Act, there is no coverage under the policy. Troutt argues that coverage under the policy is not tied to the Act. We agree with Troutt's argument.

The findings of fact and conclusions of law of the trial judge in the state court action pertaining to this case are instructive on the matter. As noted above, the state court trial judge found as a matter of fact that several members of the team had consumed alcohol, and that as a matter of law "the accident arose, at least in part, from the tavern's business of serving alcohol." *See* State Court Findings of Fact and Conclusions of Law at 7.

 Troutt cannot use the specific findings of the state court for collateral estoppel purposes because Montana law does not allow for an offensive non-mutual use of collateral estoppel, and therefore Troutt cannot use this issue to prove CWIC's liability. This is because the third prong of the collateral estoppel test in Montana inquires into whether the party *against* whom preclusion is sought was a party, or in privity with a party in the prior proceeding. *See, e.g., Young,* 856 P.2d at 965. CWIC was not a party to the previous suit. Privity is a concept not readily susceptible to a uniform definition. *See Miller v. Superior Court,* 168 Cal. App.3d 376, 383, 214 Cal.Rptr. 125 (1985). With reference to a judgment, privity applies to one who was not a party in the prior proceeding but whose interest was legally represented at trial. *See Brault v. Smith,* 209 Mont. 21, 679 P.2d 236, 239 (1984). Privies are those who are so connected with the parties in estate or in blood or in law as to be identified with them in interest. *See Tisher v. Norwest Capital Management & Trust Co., Inc.,* 260 Mont. 143, 859 P.2d 984, 988 (1993); *see also Hollaway v. Edwards,* 68 Cal. App.4th 94, 97 n. 2, 80 Cal.Rptr.2d 166 (1998) (characterizing privity as existing only where the parties have essentially "identical interests."). In this case CWIC's and Troutt's interest in the Engstrands' suit could not have been more diametrically opposed. Troutt's only avenue for avoiding to pay any judgment from her pocket was to make sure that such judgment blamed alcohol served by her business as a cause of Engstrand's injury. CWIC's interest in that suit would have been to ensure that alcohol was not mentioned at all. Thus, the parties' inimical interests stemming from the Engstrands' suit preclude CWIC from being in privity with Troutt in the state court proceeding.

 Notwithstanding Troutt's inability to assert offensive non-mutual collateral estoppel, Troutt can use the state judge's order as evidence that CWIC's liquor liability insurance is broader than the Montana Dram Shop Act. As noted above, the state court found Troutt liable to the Engstrands under a set of facts that included alcohol as a causing factor of the accident. The policy issued by CWIC contemplates coverage under this exact set of circumstances and does not bind such coverage to the Montana Dram Shop Act. If CWIC had intended to incorporate the Act as the sole arbiter of Troutt's liability, it could have simply inserted a clause to that effect in its policy. Liquor liability policies which incorporate the pertinent state's Dram Shop Act do exist. *See, e.g., Brault v. Acceptance Indem. Ins. Co.,* 538 N.W.2d 144, 147 (Minn.App.1995) (liquor liability policy read "[l]iability: [t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay by reason of civil tort liability imposed upon the insured by reason of Section 340A.801 of the Minnesota Statutes [ (the Dram Shop Act) ]"). Therefore, the plain meaning of CWIC's policy is that all liability, whether based on the Act or not, is covered, and because the state court found liability, coverage exists. CWIC's assertion that the term "liability" in its policy means "based on the Act" inserts an ambiguity into the policy, and if so, this ambiguity has to be construed against the insurance company, the pre-

sumed sophisticated party, and in favor of Troutt's interpretation. *See Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.,* 132 F.3d 526, 530 (9th Cir.1997). Thus, the policy covers liability that is broader than the Act.[2]

### C. Denial of Troutt's Summary Judgment Motion

Troutt argues that the district court erred because it did not construe the terms "arising out of" as ambiguous, as required by Montana law, and therefore refused "to honor the Montana District Court's determination" which concluded that alcohol was a factor in the accident. Troutt says that summary judgment in its favor would have been appropriate because the state court judgment implicated alcohol consumption, and the "arising out of" language only requires an injury to be "connected" to the actions insured, in this case the furnishing of alcohol. CWIC responds that the case Troutt relies on for its proposition that the term "arising out of" is ambiguous, actually construed the term "arising out of the use" and therefore is irrelevant to this issue.

CWIC is correct that the case relied on by Troutt for its argument construed the term "arising out of the use." *See Wendell v. State Farm Mut. Auto. Ins. Co.,* 293 Mont. 140, 974 P.2d 623, 638 (1999). However, after briefing was completed in this case, the Montana Supreme Court extended the *Wendell* analysis to the term "arising out of." *See Pablo v. Moore,* 298 Mont. 393, 995 P.2d 460, 462–63 (2000). Therefore, under Montana law, because the term "arising out of" is inherently ambiguous in the insurance context, it has to be construed against the insurer and in favor of the insured. *See id.* at 463

(citing *Head v. Central Reserve Life of N. Am. Ins. Co.,* 256 Mont. 188, 845 P.2d 735, 742 (1993)). Troutt urges a construction of this language that equates its meaning to "having a connection with" and because this construction is plausible, and has been adopted in other contexts, we so construe the term "arising out of" in the insurance context. *See é.g., Pinyerd v. State Compensation Ins. Fund,* 271 Mont. 115, 894 P.2d 932, 935 (1995) (defining the term "arising out of" within Montana's Workers' Compensation Act as meaning having "some reasonable connection with").

However, even though Troutt prevails on the legal argument, she cannot prevail on the result she seeks; i.e., reversal of the district court's denial of Troutt's motion for summary judgment. Troutt argues that because "arising out of" means "having a connection to," the state court's findings that alcohol was a factor in the accident are dispositive on the issue of CWIC's liability, and thus we should rule, based on the state court judgment, that coverage exists under the liquor liability policy; i.e., what Troutt is asserting is offensive non-mutual collateral estoppel, something not allowed under Montana law. *See Young,* 856 P.2d at 965 (this is because, as noted above, the third prong of the collateral estoppel test in Montana inquires into whether the party *against* whom preclusion is sought was a party, or in privity with a party in the prior proceeding, and CWIC does not fit into that categorization).

At the time that the district court denied Troutt's motion for summary judgment, it had not heard the testimony introduced by Troutt's witnesses on the use of alcohol the night before and the day of the accident.

**2.** In light of this holding we do not reach the issue regarding whether the Montana Dram Shop Act preempts Montana common law in this area. Similarly, we do not reach the

issue of whether Troutt's undertaking of a liquor liability policy waived her partial statutory immunity under Montana law.

The district court only had the state court judgment to go on, and as a result denied Troutt's attempt to use this prior judgment as a sword against CWIC. *See* Order at 2. This ruling was correct regardless of the interpretation given to the term "arising out of" under Montana law.

### D. *CWIC's Duty to Defend, Investigate, and Failure to Settle*

The timeline of the events that occurred is fundamental to these three issues: (1) October 3, 1993: Engstrand loses his fingers; (2) November 29, 1993: CWIC receives notice that a claim might be pending pertaining to the accident; (3) December 1, 1993: CWIC dispatches an investigator for this matter; (4) From December 1993, till March 1994: the investigation takes place; the investigator interviews Peggy and Lee Troutt, their attorney Tom Bostock, and receives two statements from members of the wood splitting team; none of these five separate sources mentions alcohol or hangovers being a relevant part of the accident; the investigation reveals that each team member had consumed one beer while working; (5) April 27, 1994; the investigator closes his file; (6) May 9, 1994; CWIC closes its file and instructs the investigator to inform Troutt that it is denying coverage; (7) June 20, 1994: the investigator informs Troutt that CWIC is denying coverage; (8) June 13, 1995: Vickie and Terry Engstrand file their complaint in state court against Troutt and alcohol is not mentioned as a reason for the occurrence of the accident; (9) March 5, 1996: Troutt tenders her defense in Engstrand's suit to CWIC; (10) March 7, 1996: for the first time Vickie Engstrand mentions alcohol as a possible contributing factor of the accident; however, the Engstrands never amend their complaint to reflect this fact; (11) March 15, 1996: CWIC advises both Troutt and the Engstrands that it is denying coverage and the defense of Troutt; (12) March 18, 1996:

the Engstrands offer to settle the suit with CWIC for their policy limit of $150,000, an offer that CWIC refuses; (13) December 2, 1996: the Montana state trial court enters its findings of fact and conclusions of law in which it attributes the accident, in part, to the consumption of alcohol.

 In evaluating the evidence to see if there was any unreasonable conduct by the insurer, "it is essential that no hindsight test be applied. The reasonable or unreasonable action by the [insurer] must be measured as of the time it was confronted with the factual situation to which it was called upon to respond." *Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F.Supp. 911, 918 (C.D.Cal.1994), (quoting *Austero v. National Cas. Co.*, 84 Cal. App.3d 1, 32, 148 Cal.Rptr. 653 (1978) overruled on different grounds by *Egan v. Mutual Of Omaha Ins. Co.*, 24 Cal.3d 809, 824 n. 7, 169 Cal.Rptr. 691, 620 P.2d 141 (1979)).

### 1. DUTY TO DEFEND

 . The scope of the duty to defend under Montana law is defined by the coverage provided under the policy. *See McAlear v. St. Paul Ins. Cos.*, 158 Mont. 452, 493 P.2d 331, 334 (1972). If there is no coverage under the terms of the policy based on the facts contained in the complaint, there is no duty to defend. *See Insured Titles, Inc. v. McDonald*, 275 Mont. 111, 911 P.2d 209, 211 (1996).

The complaint filed by the Engstrands in state court does not mention alcohol. When presented with Troutt's request that CWIC undertake her defense on March 5, 1996, CWIC only had the information contained in the Engstrands' complaint to go by. CWIC had already conducted an investigation into the accident a year earlier and failed to discover any alcoholic connection to the amputations. Thus, when the Engstrands' complaint was forwarded by

Troutt to CWIC, the Engstrands' failure to allege alcohol as a cause of the accident only confirmed CWIC's findings in its earlier investigation, especially given the fact that the key witness implicating alcohol in the accident had not been deposed at that time. Therefore, because the complaint failed to allege any facts that could trigger coverage and the consequent duty to defend, CWIC did not act improperly in declining to do so. *See Burns v. Underwriters Adjusting Co.*, 234 Mont. 508, 765 P.2d 712, 713 (1988).

## 2. DUTY TO INVESTIGATE

 Coverage in an insurance contract is not only controlled by the pleadings or the judgment alone, but is based upon the acts giving rise to the claims against the insured. *See New Hampshire Ins. Group v. Strecker*, 244 Mont. 478, 798 P.2d 130, 132 (1990). Insurers have the duty to investigate claims and coverage in a prompt fashion. *See Tynes v. Bankers Life Co.*, 224 Mont. 350, 730 P.2d 1115, 1124 (1986); *see also* Mont.Code. Ann. § 33–18–201 (1999) (an insurer may not "refuse to pay claims without conducting a reasonable investigation based upon all available information ...."). This duty encompasses the investigation of claims that might not be covered by the policy. *See Daly Ditches Irr. Dist. v. National Sur. Corp.*, 234 Mont. 537, 764 P.2d 1276, 1279 (1988).

The threshold date for the inquiry regarding CWIC's duty to investigate is the same as the date used to inquire about CWIC's duty to defend: March 5, 1996, the date CWIC received Troutt's request for a defense in the Engstrands' suit. At that point in time, CWIC had already conducted a three month long investigation, interviewed two witnesses to the event and their attorney, received written statements from two more witnesses to the event and a copy of the operative complaint in the matter. None of the above sources re-

vealed that alcohol was a factor in the accident. Even though Vickie Engstrand shortly thereafter testified to the possibility of alcoholic involvement, this fact was never communicated to CWIC, and the Engstrands never amended their complaint to reflect this allegation. While it is true that the Engstrands were only required to offer a short plain statement of the facts that gave rise to their claim in their complaint, it seems that omitting something as potentially relevant as an accident induced by the consumption of alcohol is more than a simple lapse in memory. Regardless of the reasons why the Engstrands' complaint was never amended, after having already conducted a three-month investigation, and armed with a complaint that only confirmed the findings of that investigation, CWIC was reasonable in its determination that no further investigation was needed. In fact, CWIC was prompt in its initial investigation, it reviewed the facts of the accident and it determined that the complaint filed at a later date stemmed from conduct which could not under any circumstances give rise to coverage. With the benefit of hindsight, this decision seems to have been erroneous, but the evaluation of CWIC's conduct has to be made at the time Troutt tendered her defense, and because the complaint and surrounding facts gathered by its investigator showed that no coverage existed, CWIC did not breach its duty to investigate. *See Daly Ditches*, 764 P.2d at 1279.

## 3. FAILURE TO SETTLE

 As seen from the timeline, when CWIC received the Engstrands' offer to settle for the policy limits, there was still no information provided to *it* that the accident arose from the furnishing of alcohol despite the fact that Vickie, in her deposition, had just begun to mention such a possibility. Troutt raises three arguments

on this issue: (1) that because CWIC improperly failed to investigate and defend, it improperly declined to negotiate a settlement with the Engstrands in violation of a Montana statute that prohibits insurers from neglecting in good faith to try and settle those claims "in which liability has become reasonably clear," *see* Mont.Code. Ann. § 33–18–201(6) (1999); (2) that the district court's ultimate finding of coverage is evidence of CWIC's improper actions; and (3) that CWIC's failure to settle was based on an improper reading of its policy as proved by the *Wendell* court's ruling pertaining to the "arising out of" language.[3]

With respect to this last contention, Troutt is trying to impose oracle-like skills on CWIC, and then holding CWIC to the fact that its ESP is lacking. While it is true that the Montana Supreme Court ruled that the insuring language in CWIC's policy was inherently ambiguous, this ruling arrived a few years following the contract made between Troutt and CWIC. Thus, even though the construction stated by the Montana Supreme Court applies to the policy, it would be singular to impose tort liability on CWIC for failing to anticipate the Montana Supreme Court rulings, especially given the fact that the Montana Supreme Court specifically accepted CWIC's construction of the ambiguous language as one of the possible ways this language can be interpreted. *See Wendell*, 974 P.2d at 636–39. Moreover, the determinative fact in CWIC's decision was not the "arising out of" language, but the fact that no alcohol-related allegation had been raised at the time it refused to settle the case.

Troutt's second argument is a classic example of hindsight analysis. It is irrelevant that CWIC was wrong in its determi-

nation that no coverage existed under the policy, because at the time the offer to settle was made, it reasonably concluded that no coverage was possible. Finally, Troutt's first argument on this issue fails because it is linked with its contention that CWIC improperly failed to defend her from the Engstrands' suit and investigate the Engstrands' allegations. As seen above, there was nothing improper in CWIC's actions on these matters.

### 4. TORT DAMAGES

Because CWIC was not liable for any tort, Troutt's claim for tort damages fails.

### E. *Attorneys' Fees and Costs*

 Federal courts look to Montana law to determine when attorneys' fees can be awarded in declaratory judgment cases. *See Iowa Mut. Ins. Co. v. Davis*, 689 F.Supp. 1028, 1029 (D.Mont.1988). Accordingly, an insured is not entitled to recover attorneys' fees for the insurance company's sole wrongful failure to provide coverage, but instead, the insured must prove that the insurance company also breached its duty to defend. *See Yovish v. United Services Auto. Ass'n*, 243 Mont. 284, 794 P.2d 682, 686 (1990).

Troutt concedes that this is the state of Montana law. Therefore, because CWIC did not breach its duty to defend Troutt, the district court did not err in denying her post-trial motion for costs and attorneys' fees in this case.

### III

For the foregoing reasons, the district court's decision is AFFIRMED in its entirety. Each party shall bear her or its own costs on appeal.

---

**3.** As seen above, the pertinent case for the construction of this language is actually *Pablo v. Moore*, 298 Mont. 393, 995 P.2d 460, 462–

63 (2000). Nevertheless, as seen above, *Pablo* does hold that the language "arising out of" is inherently ambiguous as contended by Troutt.

BETTY B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I concur in much of the majority's analysis and reasoning, but I respectfully dissent from Parts II(D) and II(E); I agree that CWIC breached its duty to indemnify but I am convinced that CWIC also breached its duty to investigate. I would hold that this failure to conduct a proper investigation caused CWIC to subsequently breach its duty to defend and fail to meet its obligation to settle. Insurers enter into relationships of statutory and contractual trust and obligation with those that they insure. Part of their obligation is to investigate claims that allegedly trigger coverage under the policies that they hold. Mont.Code. Ann. § 33–18–201(4) (1999). In this case, the defendant sold a "Liquor Liability Policy" to a tavern that covered injuries "aris[ing] out of the selling, serving or furnishing of any alcoholic beverage." The insured filed a claim asking for coverage to pay a man who lost almost all of his fingers while chopping firewood near and on behalf of the tavern. In my opinion, the Insurance Company's investigation of this claim was manifestly insufficient.

This was an ill-fated enterprise from the beginning. The group tried to split firewood by setting wood blocks on end and then dropping the business end of a piece of heavy equipment, a front-end loader, onto the blocks. Lee Troutt assumed the role of lookout, signaling the equipment operator when it was safe to drop the front-end loader's bucket. Unfortunately, he gave the signal once without noticing that Terry Engstrand had not yet cleared his hands, the bucket dropped and severed most of Engstrand's fingers.

The defendant insurer, Colorado Western Insurance Company ("CWIC"), assigned the investigation of the claim to Crawford and Company ("Crawford"), an independent adjusting firm. Crawford assigned the investigation to one of its adjusters, Charles Keady ("Keady"), who had never before conducted an investigation involving a liquor liability policy. Keady was not given a copy of the insurance policy, or otherwise informed of the coverage language at any time during his investigation or prior to the closure of his file. District Court's Finding of Fact ¶ 33.

Under Montana law, an insurer cannot "refuse to pay claims without conducting a reasonable investigation based upon *all available information.*" Mont.Code. Ann. § 33–18–201(4) (emphasis added).[1] Keady failed to meet either requirement of this statute. He only considered a fraction of the available information, and his failure to thoroughly investigate the subject matter that he did choose to consider was unreasonable. Keady conducted only three interviews: of Peggy Troutt, the insured, her husband Lee Troutt, and the couple's attorney, Tom Bostock. Through these three interviews Keady discovered that alcohol had been consumed that day; Peggy and Lee admitted that one beer had been consumed by each of the participants of the wood splitting group before the accident; they now contend that much more alcohol was drunk that day. Keady failed to ask any follow up questions. He did not try to determine what type of beer had been consumed; he did not ask whether any other alcohol had been consumed earlier that day or the night before. As the district court held, Keady did not "vigorously pursue an investigation to see if he

---

1. Although many other states have also codified the "duty to investigate," few are written as expansively as Montana's. *See, e.g.,* Minn. Stat. Ann. § 72A.201 (" 'Investigation' means a reasonable procedure adopted by an insurer to determine whether to accept or reject a claim."); Cal. Ins.Code § 790.03 ("Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.").

could 'find coverage.'" District Court's Order at 2.

The district court held that "neither bar owner suggested alcohol was a contributing cause of the loss." *Id.* This conclusion ignores a simple fact; Peggy Troutt had filed a claim for indemnity under a *liquor liability policy.* Even though, for whatever reason, Peggy and Lee did not blame alcohol for the injury in their interviews with Keady, the entire premise of Peggy's initial request was that alcohol played some role in the events that transpired.

Evidence that alcohol may have played a role in these events was legion, according to the district court, but Keady learned about almost none of it through his investigation. Keady neglected to interview the injured or his wife, who happened to be the bartender who was on duty at the tavern the night before. She could have told him that Lee Troutt, the one who signaled the front-loader operator to drop the bucket at the ill-fated moment, had a problem with alcohol and liked to add some liquor to his coffee in the morning. She had served him about a quart of rum the evening before and she saw him leave the bar at 2:00 a.m., clearly intoxicated. The man operating the front-end loader, Gary Keeper, was also at the bar the night before, drinking from 7:00 p.m. until midnight. He too left the bar intoxicated. Keady never learned any of this information.

The majority's opinion suggests that Keady's failure to learn this information was the fault of Lee and Peggy. I disagree. If Lee and Peggy had failed to cooperate or had intentionally withheld information from an otherwise diligent insurance adjuster, they would probably be to blame. In this case, however, the only explanation for Keady's failure to learn any of the critical information is that he conducted an insufficient investigation. *See Egan v. Mut. of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 145 (1979) (an insurer "must give at least as much consideration to the [insured's] interests as it does to its own") *cited favorably in Tynes v. Bankers Life Co.,* 224 Mont. 350, 730 P.2d 1115, 1124 (1986). This is not hindsight analysis. An insurance agency who writes a policy to a tavern covering accidents arising from the provision of alcohol is obligated to ask questions about the provision of alcohol when presented with a claim under that policy. An insurance adjuster who investigates an accident that causes a man to lose most of his fingers while part of a wood-chopping party is obligated to interview him as well as other members of the wood-chopping party; he should not just rest on the signed statements of two of them. An insurance adjuster who investigates an accident involving heavy machinery that takes place near and for the benefit of a tavern should interview the bartender who was on duty at that time, and search out other eyewitnesses. These are common sense conclusions. Keady, intentionally or negligently, failed to act with common sense.

After the investigation, Keady in his report concluded that there was no coverage for the incident. It was unusual to reach such a conclusion because Keady had never seen the language of the policy. Finally, on April 27, 1994, having read two statements and conducted three interviews over a four month period, Keady closed his file. Twelve days later CWIC told the adjuster to deny coverage and close its file.

Had CWIC conducted a reasonable investigation in 1995, it would have discovered the important role that alcohol played in these events, and it likely would have indemnified Troutt for the damages it owed to Engstrand. With knowledge that Engstrand's injuries arose from the furnishing of alcohol, CWIC also would have

**1166**

been under a duty to defend the lawsuit brought by Engstrand, *Burns v. Underwriters Adjusting Co.*, 234 Mont. 508, 765 P.2d 712, 713 (1988), and would have been obligated to bargain with Engstrand to effect a reasonable settlement, Mont.Code Ann. § 33–18–201(6) (insurers cannot "neglect to attempt in good faith to effectuate ... settlements of claims in which liability has become reasonably clear"). The duty to defend and settle would arise even if Engstrand's complaint failed to clearly allege the role of alcohol in the incident. *Burns,* 765 P.2d at 713 ("[T]he proper focus of inquiry is the acts giving rise to coverage, not the language of the complaint."). Because I disagree with the majority's assessment of the initial investigation, I also disagree with their holdings with respect to the duty to defend and obligation to settle. CWIC breached three critical responsibilities and, under Montana Law, owed attorneys fees to Troutt. *Yovish v. United Servs. Auto. Ass'n,* 243 Mont. 284, 794 P.2d 682, 686 (1990) ("We have approved awards of attorney fees ... in cases where an insurer has breached its obligation to defend an insured.").

The majority's holding gives a powerful incentive to insurers to conduct insufficient investigations in the first instance. Not only will the insurer save money on the cost of the investigation, but even if a claimant is persistent and resourceful enough to someday prove that the insurer should have indemnified him or her, the insurer may be saved the time and money and annoyance of defending any lawsuits that arise in the meantime. I believe that the incentives should be reversed. The insurer should be encouraged to conduct a complete and competent investigation in the first instance, to establish at an early date where the parties stand in relation to one another with respect to indemnification and the duty to defend. Not only is this sound policy and common sense, it is required under Montana law. Mont.Code Ann. § 33–18–201(4). Because the majority holds otherwise, I respectfully dissent.